UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:21-CR-00350-1 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| VIRGIL AGEE, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

In May 2021, a grand jury indicted Virgil Agee for the unlawful possession of a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). R. 1, the Indictment.[1] Now, Agee moves to dismiss the indictment, arguing that the felon dispossession statute violates the Second Amendment. R. 76, Def.'s Mot. Dismiss. For the reasons discussed in this Opinion, Agee's motion to dismiss is denied.

## I. Background

The specific facts underlying the charges are not strictly relevant to the dismissal motion, which broadly challenges the indictment on legal grounds. But for orientation's sake, this Opinion sets forth a general factual background. In mid-December 2020, Chicago Police Department officers encountered Agee in a red car parked in a vacant lot in Chicago. R. 81, U.S. Resp. at 1. The officers allegedly observed a gun in the center-console cupholder of the car, in violation of Illinois law. *Id.*

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

at 1–2. When the officers told Agee to get out of the car, Agee allegedly fled on foot and left the front-driver door open, leaving another gun in plain view atop the driver seat. *Id.* at 2. The officers recovered both firearms, as well as an extended magazine from the car's center console.

Before that day, Agee had previously been convicted of felonies in Illinois and Wisconsin, including for unlawful possession of a firearm and drug delivery. U.S. Resp. at 2. At the time of his arrest for the charge in this case, Agee was on parole. *Id.* After his arrest, a federal grand jury returned an indictment, charging Agee with knowingly possessing a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment. In April 2023, Agee moved to dismiss the Indictment on Second Amendment grounds. *See* Def.'s Mot. Dismiss. Agee argues that the statute is unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Not surprisingly, the government contests this motion. During briefing, the Seventh Circuit issued *Atkinson. See Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023). The parties filed position statements on *Atkinson*, and the government has since filed supplemental briefing in response to Agee's motion to dismiss. *See* R. 88, Def.'s Position Statement on *Atkinson*; R. 89, U.S. Position Statement on *Atkinson*; R. 94, U.S. Supp. Br.; R. 100, Def.'s Reply. For the reasons discussed in this Opinion, Agee's motion to dismiss is denied.

## II. Legal Standard

Under Federal Rule of Criminal Procedure 12(b)(1), a "party may raise by pretrial motion any defense, objection, or request that the court can determine without

a trial on the merits." When considering a motion to dismiss a criminal indictment, the Court assumes that the indictment's factual allegations are true and must "view all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). But another way to view Agee's legal challenge to the felon-dispossession statute is that the charge fails to adequately state an offense under Criminal Rule 12(b)(3)(B)(v), because the statute violates the Second Amendment. In any event, the analysis is the same given the pure question of law that is presented by the Second Amendment challenge, at least as Agee has framed it.

### III. Analysis

### A. Second Amendment

Much of this analysis is taken from *United States v. Gates*, 2023 WL 5748362, at *1–9 (N.D. Ill. Sept. 6, 2023), recently decided by this Court. Given recent developments under the Second Amendment, Agee argues that the felon-dispossession statute is unconstitutional because it violates his Second Amendment right to bear arms. The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court definitively held for the first time that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 635 (2008). The Court cautioned, however, that "like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626

3

(cleaned up).[2] And the Court further warned that *Heller* should not be interpreted to "cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626. Nonetheless, in the years since the *Heller* decision was issued, courts continue to grapple with challenges on the constitutionality of the federal felon-dispossession statute, 18 U.S.C. § 922(g)(1).

Initially, after the Supreme Court decided *Heller*, most federal courts adopted a two-step framework to evaluate Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2125. At step one, the federal courts asked whether the government could show that the regulated conduct fell outside the Second Amendment's original, historical scope; if yes, then the analysis ended there and the regulation was upheld. *Id.* at 2126. But if the historical analysis was inconclusive or suggested that the regulated conduct did have some protection under the Amendment, then the lower federal courts applied one of two levels of intensity in scrutinizing the regulation. *Id.* If the regulated conduct was at the "core" of the Amendment's protection, then courts applied strict scrutiny, requiring the government to prove that the regulation was narrowly tailored to achieving a compelling interest. *Id.* If the conduct at issue was outside the core of the Second Amendment, then the government need only show that the law survived intermediate scrutiny, that is, the regulation as substantially related to achieving an important government interest. *Id.* at 2126–27.

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

*Bruen* put an end to means-end scrutiny when analyzing Second Amendment challenges. *Bruen*, 142 S. Ct. at 2126–27. Instead, if "the Second Amendment's plain text covers an individual's conduct," then the conduct is presumptively protected. *Id.* at 2129–30. The government then bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126–27, 2130. As explained in more detail later, under this standard, courts deciding Second Amendment challenges may conduct historical inquiries into analogous laws of the past to assess "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. The government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphases in original).

Since the issuance of *Bruen*, the Seventh Circuit has clarified the analysis demanded by *Bruen*'s text-and-history test in considering—but not yet deciding— whether the federal felon-dispossession statute, 18 U.S.C. § 922(g)(1), is constitutional. *See Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).[3] Atkinson had

---

[3]The defense cites to *United States v. Holden*, 70 F.4th 1015 (7th Cir. 2023) as supporting the unconstitutionality of 18 U.S.C. § 922(g)(1). In *Holden*, however, the defendant sought to withdraw his guilty plea for answering falsely to a question on an application to purchase a firearm about whether he was under indictment, thus violating 18 U.S.C. § 922(a)(6). *Id.* at 1016. Holden argued 18 U.S.C. § 922(n)—which criminalizes purchasing or receiving a firearm while under felony *indictment*, not while having been *convicted* of a felony—violates the Second Amendment under *Bruen*. *Id.* But the court did not decide the constitutionality of 18 U.S.C. § 922(n) because Holden was not charged with violating that statute but rather with making a false statement to a firearms dealer in violation of § 922(a)(6). *Id.* at 1017. Thus, *Holden* does not apply to the Second Amendment inquiry here.

5

been convicted of a federal felony (mail fraud) some 24 years earlier. *Id.* at 1021. Invoking a civil cause of action under 18 U.S.C. § 925A, he challenged § 922(g)(1) as violating the Second Amendment. *Id.* at 1019, 1022. But this was all before *Bruen* was decided, so the district court dismissed the case, applying Seventh Circuit precedent which in turn had applied means-end scrutiny. *Id.* at 1022. During the case's pendency on appeal, the Supreme Court decided *Bruen. Id.* at 1019–20. After *Bruen*, the Seventh Circuit remanded the case back to the district court, instructing the district court to conduct a "proper, fulsome analysis of the historical tradition supporting § 922(g)(1)." *Id.* at 1022. The Seventh Circuit explained that the government's brief had provided *some* historical analysis, but "nothing close to what would satisfy the demanding standard set forth in *Bruen*." *Id.*; *but see id.* at 1038 (Wood, J., dissenting) (explaining that based on the "Supreme Court's own use of history in *Bruen*, that 18 U.S.C. § 922(g)(1) is constitutional as written").

Although *Atkinson* remanded the case to the district court, the Seventh Circuit did provide guidance on both the applicable legal standard and the scope of the historical analysis. On the legal standard, *Atkinson* explained that the government could successfully defend modern-day arms regulations—especially those "unimaginable at the founding"—by analogy. *Atkinson v. Garland*, 70 F.4th at 1021. Echoing *Bruen*, the Seventh Circuit made clear that the government need not "pinpoint a dead ringer—a well-established and representative historical *analogue* will do." *Id.* (emphasis in original) (cleaned up). That said, pointing to "only a couple of isolated historical facts and incidents, offering no detail about their application and import[,]"

6

would not suffice. *Id.* at 1022. Ultimately, the Seventh Circuit set forth five questions to "help focus the proper analysis on remand":

1. Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' ... If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?';

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1);

3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1);

4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible;

5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court

> consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights).

*Id.* at 1023–24 (cleaned up). The Seventh Circuit recognized that the historical analysis to be conducted by the district court would "no doubt yield some measure of indeterminacy" and incomplete answers, but concluded that the district court—and the Seventh Circuit, eventually (and the Supreme Court, ultimately)—would "have to give the best answer available" on whether the government met its historical-tradition burden. *Id.* at 1024.

With these governing legal principles in place, the Court considers first whether Agee's alleged conduct is covered by the plain text of the Second Amendment. If yes, then the question is whether the government has shown that the felon dispossession statute, either facially or as applied to Agee, is consistent with "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2129–30.

## B. Plain Text

Agee argues that the alleged conduct—the possession of a firearm by a person who has been convicted of a felony—is covered by the plain text of the Second Amendment, and thus is presumptively protected by the Constitution. *See* Def.'s Mot. Dismiss at 3–5; *see also* Def.'s Reply at 7–9. To repeat, the Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the

8

*people* to keep and bear Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). The government contends that the Amendment's plain text does not cover Agee's conduct because Agee is allegedly not a "law-abiding" citizen, so he is not amongst the "people" entitled to bear arms. U.S. Resp. at 6–11. In support, the government argues that the Supreme Court has repeatedly referred to "law-abiding" citizens as those protected by the Second Amendment. *Id.* at 6–9. The government also points to legal disabilities imposed on felons throughout American history, including disallowing felons from voting, serving on juries, and holding elected office. U.S. Supp. Br. at 11–12.

There is no binding precedent on whether the Second Amendment's plain text covers the possession of firearms by felons. The Seventh Circuit in *Atkinson* did not decide this issue, instead allowing the government to develop on remand its argument that the Amendment's plain text covers felons. 70 F.4th at 1024. It is true, as the government argues, that the Supreme Court in *Heller* thrice associated the right to bear arms with "law-abiding" citizens. *Heller*, 554 U.S. at 625, 635. But *Heller* decided only what it needed to decide. Each reference to "law-abiding" citizens did not constitute part of a broader *holding* that felons are categorically not amongst the "people" under the Second Amendment. *Id.* at 625 (describing *United States v. Miller*, 307 U.S. 174, 178–82 (1939), as holding that the Second Amendment does not protect firearms not typically possessed by "law-abiding citizens for lawful purposes"); *id.* at 625 (describing lack of significant prior federal regulation of firearms by "law-abiding citizens"); *id.* at 635 (describing *Heller*'s holding as protecting, at the least, the right of

9

"law-abiding, responsible citizens" to bear arms in self-defense in the home). The same can be said for *Bruen*: the Supreme Court did refer to law-abiding citizens in discussing the coverage of the Second Amendment, *Bruen*, 142 S. Ct. at 2131, 2134, 2156, but did not outright hold that firearms possession by non-law-abiders is outside the Amendment's plain text coverage of the "people." Indeed, the Seventh Circuit explained (post-*Heller* but pre-*Bruen*) that "while some of *Heller*'s language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'" *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (cleaned up). The bottom line is that *Heller*'s and *Bruen*'s repeated references to "law-abiding citizens" do not establish the proposition that the Supreme Court has already answered whether the Amendment's plain text covers firearms possession by felons. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101–02 (3d Cir. 2023) (en banc); *see also United States v. Rahimi*, 61 F.4th 443, 453–454 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023).

So the Court must look beyond *Heller* and *Bruen* to first-interpretive principles. As noted earlier, the government relies on other legal disabilities imposed on felons to inform the meaning of "people." U.S. Supp. Br. at 11–12. To the government's way of thinking, legal disabilities imposed on rights to serve on a jury, to vote, and to hold elected office all point toward interpreting "people" to exclude felons. But that argument proves—at the same time—both too little and too much. Too little because none of those legal impediments arise out of the Second Amendment. And too much

because if it were right, then all *other* constitutional-rights provisions that use the word "people" would *categorically* remove felons outside of the protection of the pertinent right. But that is not so. For example, the Fourth Amendment protects the right of the "people" to be secure in their persons, houses, and property. U.S. Const. amend. IV. Yet felons are not categorically removed from Fourth Amendment protection. The most that can be said is that in some *settings*—not categorically—felons enjoy no or reduced Fourth Amendment protection. Prisoners have no Fourth Amendment right as to prison-cell searches, *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), and that would apply to misdemeanants in prison too. Parolees may be subject to suspicionless searches without the government running afoul of the Fourth Amendment. *Samson v. California*, 547 U.S. 843, 857 (2006). But there simply is no categorical removal of felons from Fourth Amendment protection. The same goes for the First Amendment right of the "people" to peaceably assemble. U.S. Const. amend. I. The government makes no attempt to reconcile these other usages of the term "people" as including felons. So, although the government here can point to some instances in which the term "people" does not cover felons as to some rights, there are counterexamples that drain away the persuasiveness of this context-based argument.

This is not to say that the legal disabilities to which the government cites are not relevant in evaluating a regulation under the Second Amendment. The argument might very well be informative—after getting past the threshold issue of the plain text's coverage—in deciding whether there exists a historical *analogue* for the regulation at issue. But it is to say that discerning the meaning of the Second

11

Amendment's plain text—specifically the word "people"—finds little help from the context of other amendments. What is left—and where the analysis started too—is just the plain text of the Second Amendment, and no reason to think that the word "people" does not cover, on its face, all persons—including a person convicted of a felony.

## C. Historical Tradition

Although the Second Amendment's plain text presumptively protects firearms possession by felons, that does not end the analysis. Under *Bruen*, if the government can show that the felon dispossession statute is part of this country's historical tradition of firearm regulation, then the statute survives. 142 S. Ct. at 2126, 2130. The Court holds that the government has made this showing, so Section 922(g)(1) does not violate the Second Amendment.

### 1. Legal Background on the Historical Analysis

In *Bruen*, the Supreme Court applied the text-and-history analysis in deciding the constitutionality of a New York law that required applicants to show "proper cause" to be issued an unrestricted license to carry a handgun in public. 142 S. Ct. at 2117, 2156. "Proper cause" meant showing a "special need for self-protection distinguishable from that of the general community." *Id.* at 2123. The plain text of the Second Amendment protected the otherwise-lawful carrying of firearms, and the Supreme Court then held that the government had failed to show the statute was consistent with this country's historical tradition of arms regulation. *Id.* at 2135, 2138. To make this determination, the Court considered, at length, historical sources,

12

including regulations on carrying arms during our early Republic. *Id.* at 2135–36. *Bruen* ultimately reasoned that although there had been some historical regulation of the carrying of firearms in public (for example, limiting the intent for which one could carry arms), apart from a few outliers, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense[,]" nor have "American governments required law-abiding, responsible citizens" to show proper cause to carry arms in public. *Id.* at 2156.[4]

The Supreme Court has not yet applied the historical-tradition analysis to consider the constitutionality of the federal felon-dispossession statute, 18 U.S.C. § 922(g)(1). It is true that *before* the Supreme Court decided *Bruen*, the vast majority of federal courts—including those in this District—upheld the statute as constitutional. It is also true that multiple courts in this District have upheld the statute as constitutional after *Bruen*, but these cases predate *Atkinson*. *See, e.g.*, *United States v. Garrett*, 2023 WL 157961, at *4 (N.D. Ill. Jan. 11, 2023); *United States v. Price*, 2023 WL 1970251, at *4–5 (N.D. Ill. Feb. 13, 2023); *United States v. Dixon*, 2023 WL 2664076, at *5 (N.D. Ill. Mar. 28, 2023).

---

[4]Although *Bruen* invalidated New York's "may-issue" licensing regime, the Court clarified that nothing in its opinion "should be interpreted to suggest the unconstitutionality" of states' "shall-issue" licensing regimes—many of which require applicants to undergo a background check. 142 S. Ct. at 2138, n.9. The Court distinguished those regimes from New York's regime, because those licensing regimes "are designed to ensure only that those bearing arms … are, in fact 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635).

The Seventh Circuit has not yet decided the constitutionality of 18 U.S.C. § 922(g)(1) post-*Bruen*. In *Kanter v. Barr*, the Seventh Circuit upheld the statute's constitutionality applying means-end scrutiny, but this approach was abrogated in *Bruen*. 919 F.3d 437, 451 (7th Cir. 2019). Still, it is worth noting that in *Kanter*, the Court stated that though it had not expressly decided before whether felons "were historically outside the scope of the Second Amendment's protection[,]" it has "suggested that felons were not historically understood to have Second Amendment rights." *Id.* at 445.

The circuits that have decided § 922(g)(1)'s constitutionality post-*Bruen* are split. The Eighth Circuit recently upheld the statute's constitutionality, as applied to a defendant convicted of state law felonies for selling controlled substances. *See United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023). There, the Eighth Circuit reasoned that *Bruen* "did not disturb" the Supreme Court's prior "assurances" that *Heller* and *McDonald* did not cast doubt on felon-in-possession laws. *Id.* at 501–02.[5] On the historical-regulation element of the *Bruen* test, the Eighth Circuit concluded that the historical record supported legislative authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Id.*

_____

[5]One of the concurrences in *Bruen* explained that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations[,]" reiterating *Heller*'s reference to "presumptively lawful regulatory measures" as including "the longstanding prohibitions on the possession of firearms by felons." 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (citing *Heller*, 554 U.S. at 626–27 n.26). Another concurrence emphasized that all the Court "decide[d] in [*Bruen*] is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense" and the decision did not "disturb[] anything [] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2159 (Alito, J., concurring) (cleaned up).

at 504; *see also United States v. Dunn*, 76 F.4th 1062, 1068 (8th Cir. 2023) ("Following [*Bruen*], this court concluded that the felon-in-possession statute is constitutional, and there is 'no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)'") (quoting *Jackson*, 69 F.4th at 502).

But the Third Circuit recently held, sitting en banc, that the felon-in-possession statute is unconstitutional, as applied to the defendant in that case, whose previous felony was a state conviction for making a false statement on a food-stamp application. *Range*, 69 F.4th at 96, 98–99, 106; *see also United States v. Bullock*, 2023 WL 4232309, at *2 (S.D. Miss. June 28, 2023) (granting motion to dismiss a § 922(g)(1) charge, as applied, because the government "failed to establish a historical tradition supporting lifetime criminalization of [defendant's] possession of a firearm") (cleaned up).[6] The Third Circuit enjoined the enforcement of the dispossession statute against Range because the "Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range." *Range*, 69 F.4th at 98, 106. In *Range*, the government relied on historical dispossession statutes based on race and religion, the historical execution of persons with felonies, and historical forfeiture laws, but the Third Circuit rejected those as analogues because they were not "relevantly similar" to the felon-in-possession statute. *Id.* at 104–06. One of the dissents critiqued the majority opinion as applying the *Bruen* test

---

[6]In *Bullock*, the court dismissed the charge only against defendant Bullock but noted that the "federal government may continue to prosecute other persons for violating § 922(g)(1)." 2023 WL 4232309, at *31.

too narrowly, explaining that despite *Bruen* emphasizing that there is no need to identify a "historical twin," the majority essentially demanded "a Founding-era statute that imposed the 'particular' restriction for the same length of time on the same group of people as a modern law." *Id.* at 129 (Krause, J., dissenting) (quoting *Bruen*, 142 S. Ct. at 2133) (cleaned up). In sum, there is no binding authority (and courts have diverged) on whether § 922(g)(1) is consistent with the historical tradition of arms regulation in this country.

### 2. Historical Analogues

### a. No Evidentiary Hearing

To answer whether felon dispossession is consistent with the historical tradition of arms regulation, it is important first to make clear what the parties have *not* argued. For its part, the government does not argue that during the Founding era— that is, when the Second Amendment was ratified—there was any substantial set of legal regulations that specifically dispossessed felons of firearms. *See* U.S. Resp. at 14–16; U.S. Supp. Br. at 17–30.

Instead, the government relies on (1) firearms laws that banned certain groups of potential non-law-abiders from possessing firearms; and (2) more general laws that authorized capital punishment and estate forfeiture for felony sentences. *See* U.S. Supp. Br. at 17. For Agee's part, he does not quarrel with the *accuracy* of the government's proffered historical sources. Put another way, by not otherwise refuting the particular laws, treatises, or academic articles, Agee implicitly accepts that the government has presented them accurately. So no evidentiary hearing is needed in this

16

particular case, because Agee mounts no counterattack on the accuracy of the sources. Instead, Agee argues that the historical-regulation examples unearthed by the government are inapt analogues. No witness testimony, expert or otherwise, is needed to evaluate the parties' dispute given the limitation on Agee's contention here.

### b. Analogues to Felon Dispossession

The overarching inquiry is whether felon dispossession, on the one hand, and the historical analogues cited by the government, on the other, "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133. It is worth emphasizing that *Bruen* requires "only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original). In order words, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* That applies here.

Unlike the district court in *Atkinson* (which had to decide the constitutionality of the statute before *Bruen* was issued), the Court here is guided by not only *Bruen* but also the *Atkinson* questions. In its briefing after the Seventh Circuit decided *Atkinson*, the government presented historical analogues to § 922(g)(1) and explained how its analysis addresses the *Atkinson* questions. *See* U.S. Supp. Br. at 31–34.

As noted earlier, the government offers two categories of laws in support of the analogy to the modern-day felon-dispossession statute, specifically (1) firearms laws that banned certain groups of potential non-law-abiders from possessing firearms; and (2) more general laws that authorized capital punishment and estate forfeiture

for felony sentences. *See* U.S. Supp. Br. at 17–30. On the first category, as a matter of historical practice, governments did disarm those persons who were deemed to be "unvirtuous citizens." *See United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (explaining in pre-*Bruen* decision that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'") (cleaned up). By the time of the Second Amendment's ratification in 1791, there already was a historical tradition of legislatures disarming persons based on the perception (sometimes odious perceptions) that certain groups could not be trusted to abide the law or sovereign. (This is in answer to *Atkinson*'s third question, which asks whether there are broader historical analogues to, among other things, disarming dangerous groups other than felons.).

As a starting point, the government relies, in part, on Seventeenth Century English law. Though "historical evidence that long predates" the Ratification "may not illuminate the scope of the right," English law is relevant because the Second Amendment "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2119; *Heller*, 554 U.S. at 599. Unlike in *Bruen*, which concerned a general restriction on public-carry (requiring gun owners to show a special need), here the government's historical analogues from the Seventeenth Century are not "ambiguous at best," *Bruen*, 142 S. Ct. at 2119—instead, the analogues evince a solid pattern of dispossessing groups of persons deemed to be legally disobedient (or at risk of being so), *see, e.g.*, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting) (quoting

18

Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)) (explaining that in 1662 England, "officers of the Crown had the power to disarm anyone they judged to be 'dangerous to the Peace of the Kingdom'"). In England, the government repeatedly enacted regulations aimed at disarming groups that the government deemed untrustworthy to adhere to the rule of law. In 1689, shortly after the Glorious Revolution of 1688, England passed a law disarming Catholics who refused to renounce their faith; the government here compellingly contends that this categorical dispossession stemmed from the distrust of those persons to obey English law at the time (determined during a time of Protestant rule). *See* U.S. Resp. at 18–20 (citing 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71–73 (1688)); *see also* 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (English Bill of Rights providing that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law"); *Range*, 69 F.4th at 120–22 (Krause, J., dissenting). And, as explained too by the government, after the English Civil War, the restored Stuart monarchs disarmed nonconformist Protestants, including many belonging to "pacifist denominations like the Quakers." *Range*, 69 F.4th at 120–21 (Krause, J., dissenting) ("Anglicans accused nonconformists of believing their faith exempted them from obedience to the law.") (collecting sources).

Agee contends that historical English law is "hardly [a] part of the historical record the *Bruen* Court intended as part of its analytical framework for the United States or even colonial America." Def.'s Reply at 5. But again, *Bruen* explicitly acknowledged English law to be relevant to this inquiry because the Second

19

Amendment "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2119; *see also Heller*, 554 U.S. at 599. In addition, Agee critiques the English law analogues—namely, the disarmament of Catholics and non-loyalty obliging Protestants—as being ill-suited analogues. According to Agee, "[a] perceived societal ill of disloyalty to the Crown connotes dissidence and not lawlessness." Def.'s Reply at 4. The Court disagrees. Dissidence and lawlessness are inextricably tied in this context, and the English law analogues are relevant precursors to the felon dispos-session statute today. Indeed, the government persuasively contends these English analogues, though aimed at political (or religious) dissident groups, stemmed from a distrust of those groups to obey the rule of law (or sovereign). Altogether, *Bruen* de-mands not a historical twin, but an analogue. Although the English laws targeted groups not *identical* to felons, the laws did disarm these groups based on their per-ceived potential disobedience to the law (or sovereign), and so these laws serve as relevant analogues to the modern felon dispossession statute.

The government also persuasively argues that similar dispossession regula-tions during Colonial-Era America are relevant analogues to the modern felon-in-possession statute. That era's dispossession regulations targeted Native Americans and enslaved Black people. *See* U.S. Supp. Br. at 21 n.12 (collecting 17th and 18th century American laws aimed at disarming these groups); *see also Atkinson*, 70 F.4th at 1035, n.2 (Wood, J., dissenting) (collecting "laws that disarmed … members of na-tive tribes"). Though these categorical bars on possession would, of course, be uncon-stitutional today (and are and were shameful), the regulations do evince a historical

tradition of categorically disarming groups perceived as not "dependable adherents to the rule of law" or "dangerous" at the time of the ratification of the Bill of Rights. *See* U.S. Supp. Br. at 21.

Agee critiques *Jackson* (and the government here) for relying on Colonial-Era laws disarming Native Americans, religious minorities, and other groups as historical analogues. Def.'s Reply at 5. Agee argues this reliance is improper because these laws are obviously unconstitutional today (and certainly abhorrent). *Id.* But the inquiry here is not whether those laws violated the Equal Protection Clause but instead the "historical tradition that delimits the outer bounds" of the Second Amendment. *Bruen*, 142 S. Ct. at 2126, 2127, 2130. It is worth noting that the right to equal protection—via the Due Process Clause of the Fifth Amendment—was not interpreted as applying to federal laws until the mid-20th century, well after the ratification of the Second Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 500 (U.S. 1954); *see also Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). Ultimately, whether the historical analogues presented would pass constitutional muster today (especially under other amendments) is aside from the *Bruen* inquiry.

There is an even more on-point Colonial-Era analogue to § 922(g)(1): the colonies specifically disarmed persons, including "free, Christian, white men," "whom the authorities believed could not be trusted to obey the law." *Range*, 69 F.4th 96 at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)). For instance, the government cites the Massachusetts government disarming the supporters of a

21

preacher in the 1630s because "the authorities concluded their conduct evinced a willingness to disobey the law." U.S. Supp. Br. at 22 (quoting *Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637–38, 644, 648 (1937), among other sources)). The government further analogizes § 922(g)(1) to various laws, in effect during the Revolutionary War, disarming those who failed to show loyalty or obedience to the nascent American units of government. *See, e.g.*, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890); 4 *Journals of the Continental Congress* 1774–1789, at 205 (1906) (resolution of March 14, 1776). Indeed, at least six of the original 13 colonies enacted this type of legislation.[7] *See Jackson*, 69 F.4th at 503 ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty.").[8]

What's more, the government proffers other historical regulations showing that the Founders viewed the Second Amendment "to be compatible with broad

---

[7]*See Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479 (1886) (1776 Mass. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112–13 (1903) (1777 Pa. law).

[8]This analysis answers (as best as practicably can be done when the defense does not question the accuracy of the government's historical presentation) *Atkinson*'s fourth question, that is, whether the historical analogues supply enough of a historical *tradition* rather than isolated instances of regulation.

legislative authority to disarm groups who could not be trusted to follow the law." U.S. Supp. Br. at 24. This evidence includes Pennsylvania Antifederalists' proposed constitutional amendment explicitly recognizing that criminal activity can be grounds for disarmament. *See* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 665 (1971) (proposed amendment provided right to bear arms "*unless for crimes committed*, or real danger of public injury") (emphasis added); *see also Medina v. Whitaker*, 913 F.3d 152, 158–59 (D.C. Cir. 2019) (explaining the proposal reflects that "criminals … were proper subjects of disarmament"). And, at the Massachusetts convention, Samuel Adams proposed an amendment providing that the Constitution shall "never [be] construed ... to prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." *Schwartz*, at 675, 681, 758, 761 (emphasis added). It is true that, as Agee argues, the eventual adopted Second Amendment does not explicitly reference dispossession based on commission of a crime. *See* Def.'s Reply at 13. But the proposals' very existence does support the proposition that it was "obvious" to the Founders that persons who committed crimes would properly be subject to disarmament laws. *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that the Founders "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"). Also, *Atkinson*'s Question Number 2 does guide district courts to examine the relevance of "proposals emerging from the states' constitutional ratifying conventions." *Atkinson*, 70 F.4th at

23

1023. All in all, the targeting of non-law-abiding persons in the Colonial Era for fire-arms dispossession is an apt analogy for felony dispossession in the modern era.

The second category of historical regulation offered by the government comprises the sweeping criminal punishments authorized against felons. Leading up to the Colonial Era, the law of England authorized capital punishment and estate forfeiture for felony convictions. *See* 4 William Blackstone, Commentaries on the Laws of England at 95 (1769) (defining a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded"); Stuart Banner, *The Death Penalty: An American History* 23 (2002) (describing capital punishment for felonies in the late 18th century as "the standard penalty for all serious crimes"); *An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112–15 (1790) (the First Congress, which proposed the Second Amendment, making various felonies, including nonviolent felonies such as forgery, punishable by death). Indeed, the Supreme Court has recognized that, although "[n]ot all felonies were always punishable by death … Nonetheless, the link was profound." *Tennessee v. Garner*, 471 U.S. 1, 13 n.11 (1985) (citing 4 W. Blackstone, Commentaries at 98). The imposition of capital punishment or forfeiture for felonies persisted during the early Republic here in America and were not limited to overtly violent crimes. *See* U.S. Supp. Br. at 27–29 (collecting historical laws); *see, e.g.*, 2 *Laws of the State of New York Passed at the Sessions of the Legislature* (1785–1788), at 664–66 (1886) (1788 N.Y. law) (providing the punishment "for any second offense … committed after such first conviction" was "death" and that

24

capital punishment be imposed for certain felonies, including counterfeiting); *Medina*, 913 F.3d 152, 158 ("[A]t the time of the Second Amendment's ratification, nonviolent crimes such as forgery and horse theft were capital offenses.").

As a matter of logic and experience, it makes sense that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a "comparable burden," as *Bruen* frames the standard, 142 S. Ct. at 2133, to historical punishments for felonies. *See Medina*, 913 F.3d at 158 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."); *see also Jackson*, 69 F.4th at 503 (noting that early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for nonviolent offenses involving deceit and wrongful taking of property").

It is true, as Agee argues in rebuttal to the historical analogues presented by the government (*see* Def.'s Reply at 10–14), that the historical regulation of non-law-abiders did not specifically target *felons*, nor did the historical authorization of capital punishment and forfeiture specifically target *firearms*. So the comparability between those regulations and felon dispossession is far from perfect. But the government need not offer a "dead ringer." *Bruen*, 142 S. Ct. at 2133. Indeed, it is crucial to the analogical analysis that firearms technology has advanced radically since the Second Amendment's ratification in 1791. The Supreme Court in *Bruen*, and the Seventh Circuit in *Atkinson*, were both prescient in pointing out the relevance of technological

25

advancements in firearms. In *Bruen*, the Supreme Court distinguished historical analogies that might be "relatively simple to draw" versus "other cases implicating unprecedented societal concerns or dramatic technological changes [that] may require a more nuanced approach." *Id.* at 2132. In *Atkinson*, the very first question for district courts to consider is whether § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century?" 70 F.4th at 1023 (quoting *Bruen*, 142 S. Ct. at 2131). Firearms technology has advanced at a rapid pace, far outstripping the firearms-related problems that legislatures had to address in 1791. Modern firearms can fire multiple rounds without reloading, whereas most guns available in 1791 "could not fire more than one shot without being reloaded." *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015) (upholding city ordinance prohibiting assault weapons and large-capacity magazines). Modern firearms manufacturers can produce firearms at greater volumes than those in 1791. These advancements in firearms technology—both in sheer firepower and accessibility—must be considered when deciding how close a fit the modern felon-dispossession statute must be to historical regulations that dispossessed groups of non-law-abiders (at least as perceived at the time) and that authorized broad punishment of felons (again, at least at that time).

Nor is the Second Amendment the only context in which developments in firearms technology is relevant to constitutional interpretation: in *Tennessee v. Garner*, the Supreme Court considered whether the Fourth Amendment authorized the use of deadly force by the police against fleeing felons. 471 U.S. at 11–12. As of 1791, the

26

Supreme Court acknowledged, the common law rule authorized deadly force against *all* fleeing felons under *any* circumstances. *Id.* at 13–14. But in part because of technological advancements in firearms technology and accessibility—that is, "deadly force from a distance" was now possible in the modern era, when the police started to carry handguns, *id.* at 15—*Garner* held that police may use deadly force only when there is probable cause to believe that a fleeing felon poses a threat of serious physical harm either to the police officer or to others, *id.* at 11. *Garner*, and more recently *Bruen*, both acknowledge the relevance of technological changes in applying a constitutional provision to modern-day facts.

One final point is worth making in considering the relevance of modern-day firearms technology to the analogical analysis under the Second Amendment. *Bruen*, and *Heller* before it, held that the reference to "arms" in the Second Amendment refers not only to arms in existence in the 18th century. *Bruen*, 142 S. Ct. at 2132. Instead, the term "arms" also "covers modern instruments that facilitate armed self-defense." *Id.* It would be incongruous to consider the firepower and accessibility of modern-day firearms as covered by the Second Amendment when deciding how *expansive* the right to bear arms is (or is not), yet refuse to consider the firepower and accessibility of modern-day firearms when deciding the constitutionality of potential *limitations* on that very same right. When those technological developments are taken into account, the government has adequately demonstrated that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" and "is part of

the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2126, 2127, 2130.

### D. The Propriety of an As Applied Challenge

Lastly, to the extent Agee challenges the felon dispossession statute, as applied to him (he does not explicitly make such a challenge), that challenge fails. Like the defendant in *Atkinson*, Agee fails to provide "much historical basis for individualized assessments" or carveouts between "individuals who committed violent versus non-violent crimes" for § 922(g)(1) purposes. *Atkinson*, 70 F.4th at 1023.[9] To the contrary, as explained earlier, the historical analogues provided by the government support a legislative authority to disarm persons convicted of felonies, regardless of whether the conviction involved a use (or attempted use) of force. As the prior parts of this Opinion discuss, in targeting groups of persons for dispossession, the historical regulations did not parse out an individualized "dangerousness" assessment. An as-applied challenge is rejected.

---

[9]In answer (again, as best as can practicably be accomplished) to *Atkinson*'s fifth and final question, the Court concludes—absent historical evidence from the defense—that there is no basis for individualized assessments for violent versus non-violent predicate felonies.

## IV. Conclusion

Agee's motion to dismiss is denied. The felon firearm-dispossession statute, 18 U.S.C. § 922(g)(1), does not violate the Second Amendment.

ENTERED:

       s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: October 3, 2023

29