**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | No. 1:21-cr-00350 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| VIRGIL AGEE ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Virgil Agee has been indicted under the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1). R. 1, Indictment.[1] His indictment stems from the events of December 14, 2020, when Chicago police officers found two pistols in Agee's car. Agee contends that those guns were improperly seized, so he moves to suppress them as evidence. To do this, Agee has filed two companion motions.[2] One is the actual motion to suppress the firearms. R. 31, Mot. Suppress. The other seeks a hearing to determine the admissibility of evidence related to a system called ShotSpotter, which the Chicago Police Department uses to detect gunshots fired in the city. R. 30, Mot. *Daubert* Hr'g. For the following reasons, the Court denies both motions in their entirety.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2]Agee later filed a third motion seeking to dismiss the indictment on the theory that 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment. The Court will decide that motion in a separate opinion.

## I. Background[3]

Early in the morning of December 14, 2020, the Chicago Police Department received a ShotSpotter alert of gunshots at around 1628 South Pulaski Road in Chicago. R. 36, Gov't Resp. at 1–2. In response, Chicago police officers Antonio Godinez and Julio Garcia arrived on South Pulaski at around 6:46 a.m., while it was still mostly dark outside. R. 36-1, Exh. 1, Godinez Body-Cam at 06:46:00 to 06:46:04 a.m.; R. 36-1, Exh. 2, Garcia Bodycam at 06:46:09 to 06:46:13 a.m. When they stopped their separate vehicles, on their left was a vacant lot with several parked cars and, on their right, a car parked on the street with an open passenger-side door. Godinez Bodycam at 06:46:04 to 06:46:18 a.m.; Garcia Bodycam at 06:46:13 to 06:46:18 a.m. Another pair of officers who arrived in the area around 30 seconds earlier were speaking to the passenger-side occupant of that parked car. *Id.*; R. 48, 92, Bodycams 0645 and 0645(1) at 06:45:48 to 06:46:25 a.m. In any case, Godinez and Garcia met up and walked together toward the vacant lot, where Agee's car was parked with its headlights on and the driver-side window down. Godinez Body-Cam at 06:46:18 to 06:46:33 a.m.; Garcia Bodycam at 06:46:18 to 06:46:33 a.m. As the officers approached Agee's car, a woman walked away from the passenger-side door of Agee's car and toward another car parked in the lot, presumably hers. *Id.* Garcia asked whether they (Agee and the woman) are "good." Garcia Bodycam at 06:46:32 to 06:46:34 a.m.

---

[3]The facts narrated here are undisputed. They are mostly based on officer bodycam video footage.

The next 30 seconds are critical. Both officers, carrying their flashlights, walked up to Agee's driver-side window at around 6:46:33 a.m. (the precision comes from the bodycam video footage). Agee volunteered that he is letting the car warm up; Garcia then told Agee that gunshots have been reported at this location. Godinez Body-Cam at 06:46:33 to 06:46:43 a.m.; Garcia Bodycam at 06:46:33 to 06:46:43 a.m. Agree responded that he had not heard any shots and that he had just pulled up. *Id.* Garcia continued talking to Agee as Godinez moved around to the back of the car, by the passenger-side window. Godinez Body-Cam at 06:46:43 to 06:46:51 a.m. As Godinez moved around the car, Agee repeated that he is letting the car warm up. Garcia Bodycam at 06:46:43 to 06:46:50 a.m. Garcia then asked Agee twice if he has anything in the car. *Id.* at 06:46:50 to 06:46:55 a.m. Agee twice responded that he does not. *Id.* As Garcia was speaking with Agee, Garcia shined his flashlight into the driver's area, including the center-console cupholder of the car, where two plastic bottles are visible—along with the grip of an upside-down gun. *Id.* at 06:46:50 to 06:46:56 a.m. Meanwhile, Godinez was shining his flashlight through the passenger-side window. Godinez Body-Cam at 06:46:50 to 06:46:54 a.m. Garcia apparently noticed the gun at the same time as Godinez opened the passenger-side door to grab the gun from the center console. Godinez Body-Cam at 06:46:54 to 06:46:58 a.m.; Garcia Bodycam at 06:46:54 to 06:46:58 a.m. As Godinez opened the door, Garcia asked Agee whether he has a Firearm Owners Identification (FOID) card for that. Garcia Bodycam at 06:46:54 to 06:46:58 a.m. Godinez (almost) simultaneously told Agee to get out of the car. Godinez Body-Cam at 06:46:54 to 06:46:58 a.m.

3

Agee initially complied—he got out. Garcia Bodycam at 06:46:58 to 06:47:03 a.m. But then, as Garcia reached for Agee's left hand, Agee pushed Garcia and ran away. Garcia Bodycam at 06:47:03 to 06:47:07 a.m. Garcia stumbled, caught himself, and gave chase. Garcia Bodycam at 06:47:07 to 06:47:13 a.m. He quickly reached Agee on a nearby street and handcuffed him without a struggle. Garcia Bodycam at 06:47:13 to 06:47:43 a.m. Finally, another officer, Gerardo Rivera, discovered a second gun on top of the driver-side seat of Agee's now-open car (where Agee had been sitting). R. 36-1, Exh. 3, Rivera Bodycam at 06:50:07 to 06:50:40 a.m. Officers then searched the car and Garcia found an extended magazine inside of the armrest compartment of the center console. Garcia Bodycam at 06:50:19 to 06:52:30 a.m.

## II. Legal Standard

A motion to suppress evidence must be raised at the pretrial stage if it can be determined without a trial on the merits. Fed. R. Crim. P. 12(b)(3). "It is a well-established rule that the burden is on the movant to make specific factual allegations of illegality, to produce evidence and persuade the court that the evidence should be suppressed." *United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982) (cleaned up).[4] For suppression motions, courts are required to conduct an evidentiary hearing only when "a substantial claim is presented" and "there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Curlin*, 638 F.3d

---

[4] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

4

562, 564 (7th Cir. 2011). To obtain an evidentiary hearing, the defendant "bears the burden of making a prima facie showing of illegality." *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). The defendant's allegations must be "sufficiently definite, specific, non-conjectural and detailed." *Curlin*, 638 F.3d at 564 (cleaned up).

Similarly, "whether a Daubert hearing is necessary before trial lies within the district court's discretion." *United States v. Godinez*, 7 F.4th 628, 637 (7th Cir. 2021). After all, Rule 702 appoints district courts as gatekeepers of purported expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999*); Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

### III. Analysis

There are two intertwined questions to answer here. The first is whether a Rule 702 hearing is necessary to determine the reliability of the ShotSpotter gunshot-detection system. The second is whether the two guns should be suppressed as evidence because they were, according to Agee, illegally seized. The Court can answer both questions together. As explained below, it is clear from the bodycam footage of December 14 that CPD officers (1) did not need to rely on ShotSpotter to seize Agee's guns; and (2) acted legally, with probable cause to recover the guns independent of any ShotSpotter information.

### A. Timing of Seizure

Overall, Agee argues that ShotSpotter served as the basis for the illegal seizure of the guns. R. 43, Def.'s Reply. That is because, in his opinion, he was subjected to an illegal investigatory stop in the moments before he was ordered to get out of his

5

car and was arrested. *Id.* at 2. For context, an investigatory stop, like an arrest, constitutes a seizure under the Fourth Amendment. The difference is that an investigatory stop constitutes a limited intrusion—to search for weapons to neutralize present danger to the police, for example—while an arrest is the initial stage of a criminal prosecution. *Terry v. Ohio*, 392 U.S. 1, 26 (1968). Given the more limited intrusion, an investigatory stop "is reasonable, and therefore permissible, if the officer making the stop is able to point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Mays*, 819 F.3d 951, 955 (7th Cir. 2016) (cleaned up). Reasonable suspicion is a "less demanding standard" than the probable cause required to make an arrest. *United States v. Lopez*, 907 F.3d 472, 479 (7th Cir. 2018). In any case, and again, investigatory stops and arrests both constitute seizures subject to the Fourth Amendment.

That explanation leads back to Agee's main argument: that he was subjected to an illegal investigatory stop—based on an unreliable ShotSpotter alert—before the officers noticed the unconcealed gun in the center-console cupholder of his car. But that version of the events is mistaken. Ultimately, the bodycam footage dispositively shows that Agee was not seized until after the officers noticed a gun. But it is important to go through why that is step-by-step.

To begin with, Agee was parked in a public space—a vacant lot. He was not parked in a private area, like a personal garage or the curtilage of his house. *See Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.") (cleaned up). He makes no claim that

6

the officers needed some quantum of suspicion or a warrant to drive into and walk around inside the vacant lot. So the police could legitimately approach Agee's car freely and without a warrant, regardless of their reasons for being in the area. Simply put, it does not matter that the police were there because they were looking into possible shots fired based on a ShotSpotter alert. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals *on the street or in other public places* and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002) (emphasis added) (cleaned up). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification … provided they do not induce cooperation by coercive means." *Id.* (cleaned up). That last piece of a Fourth Amendment analysis is key: a "consensual encounter becomes a seizure when a reasonable person in those circumstances would not feel free to leave." *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008) (cleaned up); *see also United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) ("A person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained.") (cleaned up). "Circumstances that might indicate a seizure include the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place." *Id.* (cleaned up).

The circumstances in this case were such that no seizure—of any kind—occurred until the officers noticed the unconcealed gun in the cupholder, seized it, and ordered Agee out of his car. Before then, Agee's interactions with Godinez and Garcia were consensual and uncoerced. Again, the location in which the encounter took place was a public space. What's more, Agee was already parked in that public space *voluntarily* before the encounter happened. *See Clements*, 522 F.3d at 794 ("Clements had voluntarily stopped his car; he did not stop because of the flashing police lights."); *United States v. Hendricks*, 319 F.3d 993, 1000 (7th Cir. 2003) ("[T]his court has recognized that "in some circumstances a driver may stop his automobile on his own resulting in a consensual encounter."). Indeed, his driver-side window was open before the officers reached his car; they never had to ask him to lower it. That is relevant because the already-opened window made for a natural approach. The officers never asked Agee to do anything before engaging in conversation, as if they had approached a passerby walking on a public street. In effect, Agee volunteered that he was just letting his car warm up before the officers asked him questions about shots reported in the area. Godinez Body-Cam at 06:46:33 to 06:46:43 a.m.; Garcia Bodycam at 06:46:33 to 06:46:43 a.m.

There is also no evidence that Godinez and Garcia ever brandished their weapons, touched Agee or his car, or engaged in any other conduct that would cause a reasonable person to feel detained in the moments before the officers noticed the unconcealed gun in the center-console cupholder, seized it, and ordered Agee to get out. Godinez Body-Cam at 06:46:33 to 06:46:58 a.m.; Garcia Bodycam at 06:46:33 to

8

06:46:58 a.m. In addition, it is relevant that the whole interaction from when the officers reached Agee's car to when they noticed the gun lasted less than 30 seconds. *See United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006) (explaining that "the Fourth Amendment is not triggered when law enforcement officers merely approach an individual in a public place and ask a few questions," and noting that "only a few moments had passed between the officers' approach and [the] discovery of the ammunition in Douglass's vehicle") (cleaned up). During that half-minute, Officers Godinez and Garcia used a normal tone of voice. Garcia told Agee that gunshots had been reported in the area and asked calmly whether Agee had anything in the car. Godinez Body-Cam at 06:46:33 to 06:46:58 a.m.; Garcia Bodycam at 06:46:33 to 06:46:58 a.m. Agee responded—also in a neutral tone of voice—that he had just pulled up, was letting his car warm up, and that he did not have anything in the car. *Id.* The officers did have their flashlights on in the crucial seconds before they noticed the unconcealed gun. But use of flashlights "in a dark parking lot" to be able to see "is not a reason that would have caused a reasonable person to feel compelled to remain." *Douglass*, 467 F.3d at 624.

  Relatedly, the officers were not blocking or even touching Agee's car. If he had wanted to terminate the interaction, he had room to move his car and leave the lot. Godinez Body-Cam at 06:46:33 to 06:46:58 a.m.; Garcia Bodycam at 06:46:33 to 06:46:58 a.m. The situation would have been different had, for example, the two officers entered the vacant lot with their cars and penned him in, or had they blocked off the exit to the lot, or possibly even had they been holding on to his windowsill as

9

they spoke to him. Instead, they left their squad cars on the street, walked over, and spoke to him without touching him or his car. It is true that while Agee was talking to Garcia, Godinez walked around the back of the car to the empty passenger's side. *Id.* Still, that left Agee with plenty of room to maneuver had he chosen to end the conversation with Garcia, shut his window, and leave the lot. In other words, at no moment before the officers noticed the unconcealed gun in the cupholder, seized it, and ordered Agee out would a reasonable person have felt unable to leave.[5] In short,

---

[5] Agee asks the Court to consider that the car parked on the street when Godinez and Garcia first arrived in the area was supposedly being searched, as were its driver and passenger. Def.'s Reply at 3. He argues that he "*would have* seen" this supposed search occur, leading him to believe that he would soon be in a similar situation—that is, unable to leave. *Id.* (emphasis added). There are two major problems with that argument. The first is that Agee does not claim that he saw the supposed search of the car and its occupants before Godinez and Garcia approached him. Instead, what he argues is that he *would have* seen this happen. In other words, he avoids asserting that he actually saw a nearby search and seizure that made him feel like he was unable to leave when Godinez and Garcia first approached him. The second problem with Agee's argument is that the bodycam videos of the officers who approached the street-parked car show that there was no search of the car or seizure of its driver or passenger. Bodycams 0645 and 0645(1) at 06:45:48 to 06:46:25 a.m. Agee claims that the officers "ordered the woman passenger out of the car." Def.'s Reply at 3. That is inaccurate. The bodycam footage shows that the other officer approached the passenger door and tapped on the window; the woman opened the car door, and then the officer asked her, in a calm tone, if everything is okay. *Id.* at 06:45:48 to 06:46:25 a.m. In that same tone, he also told her that they had a call that there was a shooting. *Id.* She responded that she heard the shooting but did not see anything. *Id.* The officer then asked her one more time if she is alright, she responded that she is, and the officer walked back toward his squad car. *Id.* At no point is the passenger ordered to do anything and she never completely got out of the car (let alone at the officer's direction). As to the driver, Agee is right that he appeared from across the street after the conversation with the passenger was over. But Agee is wrong to claim that the driver was then searched. Rather, the officers asked the driver if this is his car and if he had heard any shootings. *Id.* at 06:46:25 to 06:46:47 a.m. He responded that he had not, and then unprompted unzipped his sweater, pulled up his shirt, and showed the officers his midriff, presumably to show that he does not have a gun. *Id.* at 06:46:47 to 06:47:05 a.m. The officers tell him that that is not necessary, that he is good, and that they are there because they got a call about a shooting. *Id.* The driver then repeated that he had not heard any shooting, got into his car, and closed the door. *Id.* at 06:46:47 to 06:47:08 a.m. The driver was never ordered to do anything, and the officers did not stop him when he got back into his car and shut the door, showing that he was able to terminate the encounter and

there was no seizure—investigatory stop or otherwise—based on a ShotSpotter alert.[6] The Fourth Amendment was only implicated after the officers noticed the gun in the cupholder and seized it, as explained below.

### B. Plain View

After Godinez and Garcia did notice the unconcealed gun in the cupholder, they legally seized it. The seizure was lawful because the officers saw the gun in Agee's cupholder in plain view. The plain-view doctrine permits a warrantless seizure if "(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was immediately apparent." *United States v. Schmidt*, 700 F.3d 934, 938–39 (7th Cir. 2012) (cleaned up); *see also United States v. Brown*, 79 F.3d 1499, 1508 (7th Cir. 1996) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)). The doctrine applies to evidence in cars. *United*

---

leave. In any case, the conversation with the driver happened at the same time as Agee was talking to Godinez and Garcia, so it would have been very hard for Agee to observe what was happening on the street while he was busy talking to the officers. *Id.* at 06:46:25 to 06:47:08 a.m. In all, the bodycam footage does not show that police searched another car or that they seized anyone before Agee's gun was seized and he tried to flee.

[6]Agee analogizes his case to *Florida v. J.L.*, 529 U.S. 266, 270–71 (2000), which held that officers violated the Fourth Amendment when they conducted an investigatory stop based only on an anonymous tip that a person was carrying a gun. Agee argues that the anonymous tip is to *J.L.* what the ShotSpotter alert is to this case. But as explained, the bodycam footage here shows that Agee's initial conversation with Godinez and Garcia was not an investigatory stop, but rather a consensual back-and-forth. And importantly, the seizure of his guns and his arrest were based on what the officers observed at the scene—the unconcealed gun in the cupholder followed by Agee's attempt to escape—not on an anonymous tip or (possibly unreliable) ShotSpotter alert.

11

*States v. Willis*, 37 F.3d 313, 316 (7th Cir. 1994) (applying the plain-view doctrine to the seizure of a gun from a car in a school zone).

Applying the plain-view doctrine to the facts here, first Godinez and Garcia had a "legal right to look into [Agee's] car from the street, for there is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Brown*, 79 F.3d at 1508. To repeat, Agee was parked in a public space in which police were free to engage him in consensual conversation. Second, it is clear from Garcia's bodycam footage that Agee's cupholder held two plastic bottles (one with a cap, one without) as well as an upside down, uncased gun, the grip of which is clearly visible in the video. Garcia Bodycam at 06:46:50 to 06:46:56 a.m. There is no question that the gun was sufficiently exposed from the outside of the car so that "a search to discover or verify its character [was] unnecessary." *Brown*, 79 F.3d at 1508. In short, the gun was in plain view of the officers—Agee does not dispute that.

The only close question is whether the gun's incriminating nature was immediately apparent. "For the incriminating nature to be immediately apparent, the officer must have probable cause to believe that the item is contraband or otherwise linked to criminal activity." *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004). The government argues that "the location of the uncased firearm in [Agee's car], where it was accessible to defendant, gave the officers probable cause to believe that defendant had committed the offense of unlawful use of a weapon." Gov't Resp. at 14. Specifically, the government invokes 720 ILCS 5/24-1(a)(4), the Illinois statute that

12

prohibits the carrying or possession of a firearm in a vehicle unless the gun is "broken down in a non-functioning state," "not immediately accessible," "unloaded and enclosed in a case," or "carried and possessed in accordance with the Firearm Concealed Carry Act by a person who has been issued a currently valid license." Basically, the government is arguing that it was immediately apparent to the officers that the gun in the cupholder was being improperly transported in a vehicle in violation of Illinois law because it was unconcealed, uncased, immediately accessible, and not broken down. That is a strong argument. But it has a weakness. It ignores the possibility that Agee had a valid license under the Firearm Concealed Carry Act.

On that point, the government—in a footnote—contends that the Firearm Concealed Carry Act, 430 ILCS 66/1 *et seq.*, requires that firearms transported in a vehicle remain *concealed* and on or about the person within a vehicle. Gov't Resp. at 14–15 n.5. It is obvious from the bodycam footage that the gun in the cupholder was not concealed. Its grip was clearly and easily visible from the outside. Garcia Bodycam at 06:46:50 to 06:46:56 a.m. Still, the language of the Firearm Concealed Carry Act that governs how a licensee should transport a firearm is somewhat ambiguous. The ambiguity derives from the Act's definition of a concealed firearm. Under the Act, a "concealed firearm means a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view of the public *or on or about a person within a vehicle*." 430 ILCS 66/5 (cleaned up) (emphasis added). One plausible interpretation of this definition is that the need to keep a handgun "concealed from view" does not apply when a licensee is in a vehicle, so long as the gun is on or about his person. But,

13

as the Appellate Court of Illinois has noted, that suggestion clashes with other sections of the statute—and context is crucial in statutory interpretation. For example, another subsection explains that a licensee is permitted to "keep or carry a loaded or unloaded *concealed* firearm on or about his or her person within a vehicle. 430 ILCS 66/10(c)(2) (emphasis added); *People v. Balark*, 2019 IL App (1st) 171626, ¶ 58. This Section 10(c)—unlike the Act's definition of concealed firearm—uses the term "concealed" to modify the keeping or carrying of a firearm in a vehicle, implying that if a gun is not *concealed*, it is not being properly transported. *See Balark*, 2019 IL App (1st) 171626, ¶ 58. There would be no need for the term "concealed" in that provision if—by definition—a firearm is always considered to be concealed if the firearm is on or about the person inside a vehicle.

Other parts of the Act support the interpretation that the concealed-carry statute requires that a licensee keep handguns concealed while in a vehicle. *Balark*, 2019 IL App (1st) 171626, ¶¶ 58–59. For one, the "name of the Act is the Firearm *Concealed* Carry Act." *Id.* ¶ 58 (emphasis added). Its "entire purpose" is the regulation of concealed-carry firearms. *Id.* "Illinois does not allow for open carry of firearms." *Id.* So, it follows that *public* open carry would not be allowed just because the firearm is in an automobile on the public way—as discussed earlier, there is no expectation of privacy shielding that interior of an automobile that may be viewed from outside. *Brown*, 79 F.3d at 1508. Also, Section 10(h) requires a licensee—whether driver or passenger—"to identify the location of [a] *concealed* firearm" upon the request of an officer during a traffic stop. 430 ILCS 66/10(h) (emphasis added). There again, the word

14

"concealed" is used to modify "firearm," rather than assuming that a firearm that is on or about a person in a vehicle is by definition concealed. Thus, Sections 10(c) and 10(h) support the interpretation of the Appellate Court of Illinois that the Firearm Concealed Carry Act requires the concealment of firearms by licensees in public—even while in a vehicle. *See Balark*, 2019 IL App (1st) 171626, ¶¶ 49–68. This Court agrees with that interpretation. And it has not found any cases contradicting it (nor does Agee point to any).[7]

That all means that even assuming that Agee had a concealed-carry license—though he did not—the fact that the gun was unconcealed and uncased in a cupholder would have reasonably made the gun's incriminating nature immediately apparent to the officers. Put another way, they had probable cause to believe that the gun was evidence of a crime, namely the unlawful use (really, possession) of a weapon. *See* 720 ILCS 5/24-1(a)(4). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Schenck*, 3 F.4th 943, 946 (7th Cir. 2021) (cleaned up). That standard was satisfied. The plain-view condition and placement of the gun was sufficient for a reasonably prudent person to conclude that there was a "reasonable likelihood" of wrongdoing. *Id.* In summary, the gun in the cupholder of Agee's car was legally seized without a warrant under the plain-view doctrine.

---

[7]It is worth noting that, at the least, the officer's interpretation of the statute to require concealment of a firearm within a vehicle is reasonable, even if the Illinois Supreme Court someday disagrees with it. Reasonable mistakes of law do not undermine searches and seizures. *Heien v. North Carolina*, 574 U.S. 54, 61–62 (2014).

The same is true of the second gun found on top of Agee's driver-side seat after he was arrested. That gun was also found in plain view, Rivera Bodycam at 06:50:07 to 06:50:40 a.m., and could be legally seized without a warrant for the same reasons as the first. In addition, the second gun was seized incident to Agee's arrest. *Horton*, 496 U.S. at 135 ("And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant."). The police properly conducted a search of the car after Agee's arrest because it was reasonable to believe that evidence relevant to the crime of arrest—unlawful use of a weapon (and fleeing from the police)—might be found inside. *See Arizona v. Gant*, 556 U.S. 332, 338–39, 343 (2009). By the same token, the automobile exception to the usual warrant requirement also made the post-arrest search of Agee's car proper. The automobile exception permits warrantless searches of cars when police have "probable cause to believe it contains evidence of criminal activity." *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (cleaned up). A proper search needs only a "fair probability" that contraband or evidence of a crime would be found, not "absolute certainty of such a discovery ...." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) (cleaned up). Here, the officers had already observed evidence of criminal activity, specifically the uncased, unconcealed first gun, as well as Agee's attempt to escape. Meaning that the seizure of Agee's second gun, the post-arrest search of his car, and the corresponding discovery (and seizure) of an extended magazine, were proper under several exceptions to the warrant requirement.

## IV. Conclusion

The evidence shows that neither Agee nor the firearms were seized because of a ShotSpotter alert. Rather, the firearms were recovered only after officers observed—in plain view—an uncased, unconcealed gun in his cupholder. Until then, the evidence shows that the officers were having a consensual conversation with Agee in a public place. There is thus no need to hold a Rule 702 hearing on the reliability of ShotSpotter information, because it was not the basis for Agee's arrest, the seizure of the guns and extended magazine, nor the search of his car. (If Agee goes to trial, and the government seeks to introduce ShotSpotter evidence, then another Rule 702 challenge would be litigated, along with potentially an evidentiary hearing.) Likewise, no evidentiary hearing is necessary to decide Agee's suppression motion, because there are no disputed issues of material fact given the bodycam video footage. The motions to suppress and for a Rule 702 hearing are denied.

ENTERED:

       s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: October 3, 2023